[Cite as *State v. Pippins*, 2020-Ohio-503.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| | | No. 15AP-137 |
| Plaintiff-Appellee, | : | (C.P.C. No. 14CR-1823) |
| | | No. 15AP-138 |
| v. | : | (C.P.C. No. 14CR-1320) |
| | | No. 15AP-140 |
| Keith J. Pippins, Jr., | : | (C.P.C. No. 14CR-2869) |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on February 13, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Yeura R. Venters*, Public Defender, and *Robert D. Essex*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Defendant-appellant, Keith J. Pippins, Jr., appeals a February 20, 2015 judgment of the Franklin County Court of Common Pleas, in which the court convicted him of numerous drug-related offenses and sentenced him to 74 years in prison.

{¶ 2} On March 14, 2014, a Franklin County Grand Jury indicted Pippins and eight other defendants in a 42-count indictment in case No. 14CR-1320. Pippins was indicted for engaging in a pattern of corrupt activity, in violation of R.C. 2923.32; attempted murder, in violation of R.C. 2903.02 and 2923.02; 2 counts of felonious assault, in violation of R.C. 2903.11; tampering with evidence, in violation of R.C. 2921.12; 17 counts of trafficking in heroin, in violation of R.C. 2925.03; 2 counts of trafficking in cocaine, in violation of R.C. 2925.03; 3 counts of trafficking in oxycodone, in violation of R.C. 2925.03; 1 count of trafficking in marijuana, in violation of R.C. 2925.03; 1 count of funding trafficking in

marijuana, in violation of R.C. 2925.05; 3 counts of illegal drug manufacture, in violation of R.C. 2925.04; and 1 count of having a weapon while under disability, in violation of R.C. 2923.13. The count regarding engaging in a pattern of corrupt activity did not indicate what offenses constituted the "pattern of corrupt activity" as defined in R.C. 2923.31(E) and (I).

{¶ 3} On April 10, 2014, in case No. 14CR-1823, a Franklin County Grand Jury indicted Pippins and six other defendants for crimes associated with the same alleged pattern of corrupt activity. This indictment charged Pippins with engaging in a pattern of corrupt activity, in violation of R.C. 2923.32; trafficking in heroin, in violation of R.C. 2925.03; possession of heroin, in violation of R.C. 2925.11; and three counts of having a weapon while under disability, in violation of R.C. 2923.13. The engaging in a pattern of corrupt activity count again did not state what specific offenses constituted the "pattern of corrupt activity" but did incorporate each of the offenses indicted in case No. 14CR-1315 against co-defendant Jack Morris as predicate offenses for this offense, as well as Counts 2 through 27 of this indictment.

{¶ 4} On May 30, 2014, in case No. 14CR-2869, a Franklin County Grand Jury indicted Pippins and eight other defendants for engaging in a pattern of corrupt activity, in violation of R.C. 2923.32. This count again did not indicate what specific offenses constituted the "pattern of corrupt activity" but incorporated each of the offenses indicted in case Nos. 14CR-1315 and 14CR-1825, as well as Count 2 of this indictment, as a predicate offense for this offense.

{¶ 5} The first indictment was apparently based on evidence obtained via wiretaps and information proffered by cooperating members of the drug dealing group. The second indictment was based on the fruits of a search of Pippins' house at the conclusion of the wiretap investigation. The third indictment was intended to correct perceived deficiencies in the first two attempts to indict a pattern of corrupt activity.

{¶ 6} On July 16, 2014, State of Ohio, plaintiff-appellee, filed a motion to join case Nos. 14CR-1320, 14CR-1823, and 14CR-2869 into a single case for trial. On December 12, 2014, Pippins filed a motion to suppress the wiretap phone calls. On December 23, 2014, the state filed a memorandum and attached copies of the warrant applications and materials related to the wiretaps.

{¶ 7}    The trial court did not issue any written ruling on the motions, but it held a hearing on them on December 12, 2014.  At the hearing, the trial court appeared to suggest the issue of joinder had been taken care of at a previous status conference, but the record does not reflect any such disposition and the state suggested perhaps the issue had not been resolved.  Although Pippins' trial counsel never filed a formal severance motion, counsel did join a renewed motion for severance at the start of trial at which time the trial court noted the objection and stated, as it had in the December 12, 2014 hearing, that it had already ruled on such objections.  During the December 12, 2014 hearing, the parties also discussed dismissing two of the counts for engaging in a pattern of corrupt activity and the two counts related to marijuana, but no dismissal was ever filed.  The trial court suggested that once the dismissal took place, the indictments would essentially be consolidated and renumbered for trial.  The defense objected that it was extremely challenging to determine which counts were going forward to trial or to match up conduct with the generic allegations in the several indictments, noting that it had never been provided with a sufficiently detailed bill of particulars.  Defense also suggested that for appellate purposes, dismissals and renumbering should be put on the record.  The prosecution responded to the lack of clarity by indicating that it would go through the evidence with defense counsel to explain which matters in the indictment were supported by which evidentiary items and indicated that it had prepared a chart of the offenses.

{¶ 8}    No order consolidating the cases or joining the defendants for trial was ever filed or read into the record.  According to statements made during trial, the counts were, in fact, renumbered.  Yet, no amended or renumbered indictment was ever filed.  Although an e-mail chain was filed mid-trial that sets forth the wiretap files that correspond to each count in the Morris indictment in case No. 14CR-1315, no detailed bill of particulars was filed and no chart showing the relationship between the renumbered counts and the original indictments was ever filed.  Although there was a listing of renumbered offenses within the jury instructions, a copy of the jury instructions was not filed, and the trial court did not read that portion of the jury instructions into the record when it orally instructed the jury.  While the trial court noted on the first day of trial that the pattern of corrupt activity counts in the first two indictments were being dismissed, no entry ever issued to that effect.  Although the verdict forms ultimately did not include any marijuana offenses,

no dismissal entry was ever filed as to those counts. Regardless, Pippins and two other defendants were tried together before a jury in a four-week trial in early 2015.

{¶ 9} At trial, two detectives testified to the results of the wiretapping operation and played several hours of recorded telephone calls for the jury in which Pippins discussed drug dealing with his co-defendant, Percy R. Burney, Sr., and with other members of the alleged enterprise. In every telephone recording presented by the state, Pippins was one of the speakers. A great number of the calls presented were explicitly about transactions for drugs in which Pippins was either the buyer or seller. There were also two calls in which Pippins requested Burney procure a drug addict to test the potency of Pippins' drugs. There were a series of calls regarding an incident where a customer of Pippins robbed him, and Pippins sought to find the robber and contacted sources, including Burney, to obtain guns. Then, following a shooting at which the robber was the target, additional calls were presented in which Pippins discussed the shooting and sought to dispose of a gun and deflect blame. Some recorded jail calls were also played for the jury, including one where Pippins discussed retaliation against a former co-defendant who was planning to testify against him.

{¶ 10} A detective who ran surveillance for the investigation testified that generally the movements of the persons overheard talking on the telephone calls could be and were observed by surveilling them. However, he admitted he never actually saw anyone with drugs, and another prosecution witness admitted they had not surveilled the shooting and were unable to stop it from occurring.

{¶ 11} Another detective and an FBI agent testified regarding the information contained in various phones that were seized when police searched houses associated with the targets of the wiretap investigation on March 7, 2014. Two detectives authenticated photographs taken during the execution of search warrants and presented evidence recovered at the scene of the shooting, which was alleged to have been an attempt by Pippins to target a man who robbed him. The state introduced testimony and stipulations regarding the drugs and weapons found during the searches of Burney's and Pippins' residences. The parties also stipulated Pippins' prior record was such that he was forbidden from possessing a firearm.

{¶ 12} Former co-defendants, Morris, Tyler Griffin, and Larry Stevenson, who agreed to cooperate with the prosecution in exchange for favorable plea agreements, also testified. Morris confirmed he and Pippins were partners during the period of the wiretap investigation, they pooled their money in order to buy drugs, and split the drug dealing profits evenly between them. He explained they had a Mexican connection from whom they daily purchased heroin, up to 36 ounces at a time, and on four occasions they purchased two kilos at once. Morris detailed how he and Pippins carried out the shooting together— Pippins as the trigger man and Morris as the driver. At some juncture, however, Morris had started to become less involved in the drug trade, and Pippins took over more responsibility. Morris testified the day they were arrested Pippins had obtained drugs from the Mexican connection. Morris added he feared retaliation from his former co-defendants as a result of his decision to testify and stated Pippins had explicitly threatened to burn down his house if he testified.

{¶ 13} Griffin testified he and Pippins were involved together in the drug trade but claimed he had no partners and was a solo individual using people as needed. However, he admitted he gave Pippins prescription pills on credit to sell, and he sold Pippins marijuana. He recounted that Pippins had confessed to him the details of the shooting.

{¶ 14} Stevenson testified Pippins was engaged in drug dealing. He explained Pippins would give him heroin on credit to sell, and he would then pay Pippins for the heroin. This happened, he testified, on six or eight occasions.

{¶ 15} On January 29, 2015, after several weeks of trial, the parties gave closing arguments. By the time of closing, some jurors were starting to have scheduling problems due to the lengthy nature of the proceedings. Juror No. 7 was therefore excused, and Alternate No. 2 took her place. The jury did not reach a verdict before Alternate No. 2 also had an unavoidable scheduling conflict. Thus, after one day of deliberation, Alternate No. 2 was replaced in her role as Juror No. 7 by another alternate, and deliberation began anew on Monday, February 2, 2015.

{¶ 16} On Friday, February 6, 2015, the bailiff brought to the court's attention that one juror felt the others were attempting to intimidate her. In light of this, the trial court suggested to the parties and their counsel that it should perhaps give an instruction and a modified charge pursuant to *State v. Howard*, 42 Ohio St.3d 18, 26 (1989). Thereafter, if

the jury still could not reach a verdict as to all counts by the end of that day, the court would call them in and take verdicts on whatever counts they had reached a verdict and declare a mistrial as to any others.

{¶ 17} Having considered the matter, shortly after 11:00 a.m., the trial court gave the jury a modified charge pursuant to *Howard*. After more than three additional hours of deliberation, at 3:00 p.m., the jury asked by what time they would have to complete deliberations that day in order to depart by 6:00 p.m. Rather than directly respond, the court and the parties agreed to submit a question to the jury whether it believed that continuing deliberations would be helpful regarding those things they had yet to consider. When the jury responded with an underlined, "No," the trial court decided to call the jury in and take whatever verdicts they had and declare a mistrial as to any remaining counts. (Emphasis sic.) (Tr. at 4317.)

{¶ 18} The jury found Pippins guilty of Count 1 (engaging in a pattern of corrupt activity); Counts 26 and 27 (felonious assault); Counts 2, 4, 5, 7, 10, 12, 16, 18, 19, 20, 21, 23, 24, 29, 30, 32, and 34 (heroin trafficking); Counts 3 and 13 (cocaine trafficking); Counts 14, 15, and 22 (oxycodone trafficking); Counts 9, 17, and 31 (manufacture of drugs); Count 33 (heroin possession); Counts 6, 35, 36, and 37 (weapon under disability); and Count 28 (tampering with evidence). The jury found Pippins not guilty of Count 11 (heroin trafficking). The jury failed to reach a verdict on Count 25 (attempted murder).

{¶ 19} Counsel requested a poll of the jurors. During the juror poll, Juror No. 7 requested to speak to the judge. A lengthy discussion ensued in which Juror No. 7 indicated she had been pressured by her fellow jurors on a number of counts, had doubts as to others, and was confused about how she had voted on still others. She also expressed that she was confused and that "all the charges [were] running together." (Tr. at 4375.)

{¶ 20} In an entry six days following the verdict on February 10, 2015, the trial court declared a mistrial on Counts 10, 16, 17, 20, 21, 26, 27, 29, 30, 32, and 33 as to Pippins. It reduced Count 2 from a second-degree to a fifth-degree felony based on Juror No. 7's uncertainty as to the quantity of drugs. The trial court's entry also stated that Juror No. 7 had been pressured as to Count 34 and asserted in a footnote that a mistrial would be declared as to Count 19. However, it did not declare a mistrial as to either Count 19 or 34 in the conclusion of its entry.

{¶ 21} On February 13, 2015, the trial court held a sentencing hearing. The trial court sentenced Pippins to 11 years consecutive on Count 1 (engaging in a pattern of corrupt activity), 1 year concurrent on Count 2 (heroin trafficking); 11 years concurrent on Count 3 (cocaine trafficking); 6 years consecutive on Count 4 (heroin trafficking); 6 years consecutive on Count 5 (heroin trafficking); 1 year concurrent on Count 6 (weapon under disability); 6 years consecutive on Count 7 (heroin trafficking); 6 years concurrent on Count 9 (manufacturing drugs); 6 years consecutive on Count 12 (heroin trafficking); 18 months concurrent on Count 13 (heroin trafficking); 4 years consecutive on Count 14 (oxycodone trafficking); 4 years consecutive on Count 15 (oxycodone trafficking); 11 years consecutive on Count 18 (heroin trafficking); 6 years consecutive on Count 19 (heroin trafficking); 6 years concurrent on Count 22 (oxycodone trafficking); 4 years consecutive on Count 23 plus 3 consecutive years for a firearm specification (heroin trafficking); 4 years concurrent on Count 24 (heroin trafficking); 3 years concurrent on Count 31 (manufacturing drugs); 6 years consecutive on Count 34 (heroin trafficking); 1 year concurrent on each of Counts 35 through 37 (weapon under disability); and 1 year concurrent on Count 28 (tampering with evidence) with 1 consecutive year for a related firearm specification. In total, the court imposed a sentence of 74 years.

{¶ 22} On February 20, 2015, the prosecution requested, and the trial court granted, dismissal of Counts 10, 16, 17, 20, 21, 26, 27, 29, 30, and 32. Though a mistrial was also declared as to Count 33 in the trial court's February 10, 2015 entry, the dismissal entry on February 20, 2015 did not include that count.

{¶ 23} The same day, February 20, 2015, the trial court issued a judgment entry. In the entry, the court noted a mistrial had been declared as to Counts 10, 16, 17, 20, 21, 25, 26, 27, 29, 30, 32, and 33. The trial court journalized the same 74-year sentence it imposed orally during sentencing.

{¶ 24} Pippins appeals the judgment, asserting the following four assignments of error:

> [I.] Defendant-Appellant was denied due process of law as guaranteed by The Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16, of the Ohio Constitution due to the involvement of the presiding judge in the investigation of the crimes for which he was charged.

[II.] Defendant-Appellant's conviction for the offense of engaging in a pattern of corrupt activity in violation of R.C. 2923.32 was not supported by sufficient evidence.

[III.] Appellant was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when trial counsel failed to file a motion for severance.

[IV.] The trial court committed plain error by not declaring a mistrial on all counts of the indictment.

{¶ 25} The plain error standard is implicated in some of Pippins' assignments of error. According to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To show plain error, an appellant must show that: (1) there was error; (2) the error was plain, i.e., obvious; and (3) the error affected substantial rights. *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). In *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, the Supreme Court of Ohio explained:

> [E]ven if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." [*Barnes* at 27.] The accused is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims. *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (construing Fed.R.Crim.P. 52(b), the federal analog to Crim.R. 52(B), and also noting that the burden of proving entitlement to relief for plain error "should not be too easy").

*Id.* at ¶ 22. Thus, an accused seeking to show that an obvious error affected his or her substantial rights and, thereby the outcome, must demonstrate "a reasonable *probability* that the error resulted in prejudice," such that there is a "probability of a different result [that] is sufficient to undermine confidence in the outcome of the proceeding." (Emphasis sic and internal quotation marks omitted.) *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 130.

{¶ 26} For ease of discussion, we will address Pippins' fourth assignment of error first. In his fourth assignment of error, Pippins argues the trial court plainly erred when it failed to order a mistrial on all counts based on uncertainty following the poll of Juror No. 7. "Crim.R. 31(D) grants the trial judge or any party the absolute right to have the jury polled after it has returned its verdicts." *State v. Sneed*, 63 Ohio St.3d 3, 14 (1992), fn. 5. "If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged." Crim.R. 31(D). Thus, in the event of non-unanimity, a trial court has discretion (and therefore we review for abuse of discretion) whether to direct the jury "to retire for further deliberation" or to "discharge[]" the jury. *Id.* A court does not have discretion, however, to accept a non-unanimous verdict in a criminal case.

{¶ 27} Crim.R. 31(A) explicitly states that a "verdict shall be unanimous." The Ohio Constitution requires that "[t]he right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." Ohio Constitution, Article I, Section 5. However, the Supreme Court has confirmed that Article I, Section 5 of the Ohio Constitution requires juror unanimity in criminal cases.

> [O]ur opinion is, that the essential and distinguishing features of the trial by jury as known at the common law, and generally, if not universally, adopted in this country, were intended to be preserved, and its benefits secured to the accused in all criminal cases, by the constitutional provisions referred to. [Ohio Constitution, Article 1, Section 5.] That it is beyond the power of the General Assembly to impair the right, or materially change its character; that the number of jurors cannot be diminished, or a verdict authorized short of a unanimous concurrence of all the jurors.

*Work v. State*, 2 Ohio St. 296, 306 (1853) (overruled as to the holding regarding the absolute immutability of the number of jurors in misdemeanor cases in *State ex rel. Columbus v. Boyland*, 58 Ohio St.2d 490 (1979), syllabus); *see also State v. Robbins*, 176 Ohio St. 362, 364 (1964); *McHugh v. State*, 42 Ohio St. 154, 156 (1884); *see also Richardson v. United States*, 526 U.S. 813, 820 (1999) (remarking that "this Court has indicated that the [federal] Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that

definition risks serious unfairness and lacks support in history or tradition"); *but cf. State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 35 (plurality decision remarking that Ohio only imposes a unanimity requirement by rule).

{¶ 28} Because unanimity is required explicitly by rule and implicitly by the Constitution, when there is " '[i]n any case * * * the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for "there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." ' " *Sneed* at 14, quoting *United States v. Morris*, 612 F.2d 483, 489 (10th Cir.1979), quoting *Cook v. United States*, 379 F.2d 966, 970 (5th Cir.1967). Thus, " 'a jury has not reached a valid verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered.' " *Sneed* at 14, fn. 5, quoting *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir.1975). And once a jury has been discharged, the verdict cannot be altered. *Sargent v. State*, 11 OHIO 472, 473 (1842).

{¶ 29} Thus, although a trial court has discretion about whether to discharge a jury or require its members to deliberate further, pursuant to Crim.R. 31(D), the Ohio Constitution and Crim.R. 31(A) prohibit a conviction based on a verdict that is not unanimous, at least as to outcome. A trial court has no discretion to accept a non-unanimous verdict in a criminal case because "no court has discretion to violate the law." *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-360, ¶ 7; *Irvin v. Eichenberger*, 10th Dist. No. 16AP-657, 2017-Ohio-5601, ¶ 40. Generally, as discussed above, an accused seeking to show that an obvious error affected his or her substantial rights, and thereby the outcome, must demonstrate a "reasonable *probability* that the error resulted in prejudice," such that there is a "probability of a different result [that] is sufficient to undermine confidence in the outcome of the proceeding." (Emphasis sic and internal quotation marks omitted.) *Myers* at ¶ 130; *Rogers* at ¶ 22. But no conviction may stand on a non-unanimous verdict because a defendant has a "substantial right to a unanimous jury verdict." *State v. Rawson*, 10th Dist. No. 14AP-1023, 2016-Ohio-1403, ¶ 24. Thus, an unanimity error is a "defect[] affecting substantial rights." Crim.R. 52(B). Or, in other words, a unanimity error always affects the outcome; hence, such errors are plain. *Id.* at ¶ 23-24*; United States v. Ullah*, 976 F.2d 509, 514 (9th Cir.1992).

{¶ 30} In this case, the jury initially announced verdicts finding Pippins guilty of Count 1 (engaging in a pattern of corrupt activity); Counts 2, 4, 5, 7, 10, 12, 16, 18, 19, 20, 21, 23, 24, 29, 30, 32, and 34 (heroin trafficking); Counts 3 and 13 (cocaine trafficking); Counts 14, 15, and 22 (oxycodone trafficking); Counts 9, 17, and 31 (manufacture of drugs); Count 33 (heroin possession); Counts 26 and 27 (felonious assault); Counts 6, 35, 36, and 37 (weapon under disability); and Count 28 (tampering with evidence). Thereafter, the defendants, including Pippins, requested that the jury be polled.

{¶ 31} As explained above, during the juror poll, Juror No. 7 indicated she had been pressured by her fellow jurors on a number of counts, had doubts as to others, and was confused about how she had voted on still others. Juror No. 7 kept detailed notes regarding her deliberations on all the counts, although those notes are not part of the record on appeal. Pippins did not object to the manner in which the trial court polled Juror No. 7.

{¶ 32} Initially, it is important to note that, in his fourth assignment of error, Pippins does not raise a specific unanimity challenge to the guilty verdict on any of the counts. Instead, Pippins maintains that because Juror No. 7 expressed misgivings about her guilty verdict on certain counts, the trial court committed plain error by failing to declare a mistrial on all counts.

{¶ 33} Outside the hearing of the jury, the trial court reviewed Juror No. 7's notes with regard to each count. With regard to Count 1, the following discussion took place:

> THE COURT: Okay. You're Juror Number 7.
>
> Okay. Now, with regard to the verdicts involving Keith Pippins, are these your verdicts?
>
> JUROR 7: Yes.
>
> THE COURT: Freely, voluntarily, and independently found and entered by you?
>
> JUROR 7: Can I ask you a question, or can I say anything?
>
> THE COURT: Yes. I'll tell you what. Why don't you write it down? Can you do that?
>
> Let me just give you a piece of paper and a pen.
>
> THE COURT: Thank you.

Okay.  Okay.  What I'm going to do then is I'm going to go through these individually with you.  Okay?

All right.  And let's see here.  Okay.  Count 1, I'm going to go -- these are all with regard to Mr. Pippins.  Okay.  What?

Tell you what.  Do you want to approach?

JUROR 7:  Yes.

THE COURT:  Okay.  Come on and do that.

Noise, again, please.  Then we will need counsel up here as well.

[PIPPINS' COUNSEL]:  Do you want the attorneys?

THE COURT:  Yes.  Noise, please.

- - -

Thereupon, the following discussion was held at the bench with the court and counsel outside the hearing of the jury:

THE COURT: Okay.  Now, let me just get your note here.  Okay.  It says here some of the charges I wasn't quite clear about.  Hence the reason for my further note.

Okay.  So that's why I wanted to go over each one of these with you.  And, basically, I'll hand them to you.  Okay?  And then --

JUROR 7:  You know that packet that you gave us?  If I could look at that.

THE COURT:  Yes.  Go get it.

JUROR 7:  Thank you.

THE COURT:  I think that was the one that said do we have to -- is it an all or nothing type of thing.

Come on up here, please.  Thank you.

Now, how do you want to go through this?  You got them all?

JUROR 7:  Yeah.

THE COURT:  Very good.

JUROR 7:  I have detailed notes.

THE COURT: Let's go back to Count 1 then, and that starts right here. Showing us your notes, and we'll start out with Count 2, Keith Pippins, these are your notes, right?

JUROR 7: Yes.

THE COURT: What you've got here is Count 2, Count 2, guilty. And checkmark, that means you agree with that?

JUROR 7: I had questions. I had some questions.

THE COURT: With Count 2 you had a question, you say?

JUROR 7: Um-hmm.

(Tr. at 4359-61.)

{¶ 34} From the above excerpt, it is clear the trial court did not indicate verbally on the record the content of Juror No. 7's notes regarding Count 1. Instead, the court mentioned Count 1 briefly and then moved on to discuss Count 2.

{¶ 35} However, following the polling of Juror No. 7, the trial court stated, "I don't think—there was nothing with regard to Count 1." (Tr. at 4388.) Defense counsel did not object. After listing all the counts in the indictment on which Juror No. 7 "was uncertain about a verdict, felt pressured into or anything else," the trial court stated, "Okay. And other than that, the court finds, as Juror Number 7 so stated, the remainder of the counts were freely, voluntarily, she was in accord with." (Tr. at 4378, 4389.)

{¶ 36} "A jury poll's purpose is to ' "give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." ' " *State v. Monroe*, 10th Dist. No. 01AP-275 (Sept. 25, 2001), quoting *State v. Hessler*, 90 Ohio St.3d 108, 121 (2000), *cert. denied*, 532 U.S. 998 (2001), quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958). Here, when the trial court asked Juror No. 7 to write down any questions she may have, Juror No. 7 handed the trial judge a note reportedly stating: "some of the charges I wasn't quite clear about." (Tr. at 4360.) During the subsequent colloquy, Juror No. 7 never expressed any disagreement with her guilty verdict as to Count 1. Our impression of Juror No. 7 from reading the entire colloquy is that Juror No. 7 was eager to express her

opinions regarding her verdict as to each count in the indictment on which she felt pressured or uncertain.  Thus, in our view, the trial transcript supports the trial court's finding that Juror No. 7 did not have any reservations about the guilty verdict as to Count 1.

{¶ 37}  In addition, the trial court subsequently issued a February 10, 2015 entry, in which it stated: "First, [Juror No. 7's] notes indicate that there was no problem with the first count."  (Feb. 10, 2015 Entry at 2.)  The February 10, 2015 entry is an important part of this record that the trial court may consider in ruling on Pippins' assignments of error.  In the entry, the trial judge painstakingly set out the events that occurred during his colloquy with Juror No. 7 based on the notes he had taken during the colloquy and the observations he made of Juror No. 7 as she discussed her verdicts on the various counts in the indictment.  At the close of that entry, the trial court stated: "Based on the foregoing, this Court declares a mistrial as to those counts where Juror #7's statements caused a lack of unanimity."  (Feb. 10, 2015 Entry at 3.)

{¶ 38}  An appellate court reviewing a trial court's decision on a motion for mistrial generally defers to the judgment of the trial court, as it is in the best position to determine whether the circumstances warrant a mistrial.  *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 51, citing *State v. Glover*, 35 Ohio St.3d 18, 19 (1988).  "If there is doubt whether a juror has agreed to the verdict, the court may interrogate the juror to clarify his or her answer."  *Monroe*, citing *State v. Brumback*, 109 Ohio App.3d 65, 72 (9th Dist.1996).  "The court's determination of whether further interrogation is necessary is given wide discretion because the 'trial court was in a better position to view the demeanor and actions of the juror.' "  *Id.*, quoting *State v. Williams*, 73 Ohio St.3d 153, 167 (1995), *cert. denied*, 516 U.S. 1161 (1996).

{¶ 39}  Here, the trial judge was in the best position to view the demeanor and actions of Juror No. 7 with regard to Count 1 and to make a determination as to whether she was certain regarding her verdict of guilty as to Count 1, whether it was the result of pressure from other jurors, or whether it was the product of the normal deliberative process.  There was nothing in the record to refute the trial court's recollections and findings in its February 10, 2015 entry with regard to Count 1 and, in fact, the trial judge's comments after his colloquy with Juror No. 7 support the court's conclusions in the February 10, 2015

entry. For these reasons, based on the plain error standard, we find the trial court did not err when it found Juror No. 7 was not uncertain or pressured with regard to her guilty finding as to Count 1.

{¶ 40} As to Count 2, the juror indicated she was uncertain as to the amount of drugs involved:

> THE COURT: With Count 2 you had a question, you say?
>
> JUROR 7: Um-hmm.
>
> THE COURT: It was a question as to the amount involved?
>
> JUROR 7: Yes.
>
> THE COURT: So guilty but what was the amount; is that a fair statement?
>
> JUROR 7: Yes. I needed them to give me further information for me to make a decision because we weren't in agreement.

(Tr. at 4361-62.) Thus, the trial court properly found Pippins guilty only of the lowest degree of the offense. S*ee also* R.C. 2945.75(A)(2) (requiring that a guilty verdict state either the degree of the offense or the elements making it a higher degree and providing that otherwise the verdict is a finding only as to the least degree of the offense).

{¶ 41} As to Counts 10 and 11, Juror No. 7 indicated results that were different from the verdict forms, which found Pippins guilty on Count 10 and acquitted him on Count 11:

> THE COURT: Okay. Count 10?
>
> JUROR 7: Um-hmm. I went to the audio. I got not guilty there.
>
> THE COURT: That's Count 11 you found not guilty?
>
> JUROR 7: No. I was fine.
>
> THE COURT: 11 the verdict was guilty, and that was fine?
>
> JUROR 7: Um-hmm.

(Tr. at 4364-65.) This raises a clear inference that the guilty verdict on Count 10 was not unanimous and, thus, the trial court did not err in declaring a mistrial on this count. We

note an acquittal is not generally appealable and no party has attempted to appeal on this ground. *See State v. Keeton*, 18 Ohio St.3d 379 (1985), syllabus.

{¶ 42} As to Counts 15, 16, and 17, the following discussion took place:

> THE COURT: Okay. Count 15?
>
> JUROR 7: I was on the fence on this, but I voted guilty.
>
> THE COURT: Well, do you believe that he was guilty? Did the state meet its burden of proof? Are you satisfied that it's a guilty verdict here?
>
> Again, you reach a verdict based on your own decision, not upon the consensus, or what have you, just to be friendly.
>
> JUROR 7: I think that's what I did there.
>
> THE COURT: Why you did what?
>
> JUROR 7: I think I was pressured into that decision.
>
> THE COURT: Count 15 or which count?
>
> I think we had gotten to -- I think we were at 15.
>
> No. I'm sorry. We were at 16.
>
> JUROR 7: We was here.
>
> THE COURT: So that's what you're not sure. Everything else is fine but that one?
>
> JUROR 7: Um-hmm.
>
> THE COURT: No. That was not her verdict, at least at that point. I'm going to highlight that one. Just going to put a little highlight through so that I know. Her Counts 2 or 3, well we'll come back to that. Okay.
>
> [PIPPINS' COUNSEL]: I would like to note her language was she felt she was pressured.
>
> THE COURT: Yes. I understand that.
>
> Okay? Let me continue. Thank you.
>
> All right. Count 17. All right? There you've got question marks, and you've got some of your own notes there.

> JUROR 7: I have to say this too. I have no understanding of drugs and the terminology, you know, the language and stuff. I think I even mentioned that in here, and so they was talking about cutting stuff, melting stuff, I got to cut it, I got to fix it. Our understanding back there was not the same, and we would go around and around.
>
> THE COURT: With regard to 17, you're not sure?
>
> JUROR 7: Um-hmm.

(Tr. at 4365-67.)

{¶ 43} With regard to Count 15, the above discussion does not make clear whether Juror No. 7 felt pressured in arriving at her guilty verdict on this count. However, in the trial court's February 10, 2015 entry, the court found that "[a]lthough the transcript is unclear, the Court notes that in reviewing her notes and her statements, Count 15 was a guilty verdict she agreed with, but she was not certain as to Counts 16 and 17." (Feb. 10, 2015 Entry at 2.) The footnote accompanying the trial court's finding regarding Count 15 provides as follows: "The transcript appears to indicate that the discussion was in regard to Count 15, but at the bench, Juror #7's review of her notes at the time, including her hand gesture to the correct count at the bench conference to the specific counts, make it clear that it was Counts 16 and 17 she felt pressured into signing, and not Count 15." (Feb. 10, 2015 Entry at 2.) As explained above with regard to our analysis of Count 1, the February 10, 2015 entry is an important part of the record in this case and may be considered as such by this court on appeal. Therefore, based on the explanation provided by the court in its February 10, 2015 entry, we find the trial court properly found that Juror No. 7 was not pressured into finding Pippins guilty on Count 15.

{¶ 44} With regard to Counts 16 and 17, the above discussion is somewhat more clear that Juror No. 7 felt pressured to find Pippins guilty on those counts. The trial court confirmed in its February 10, 2015 entry that hand gestures by Juror No. 7 showed she felt pressured into finding Pippins guilty on Counts 16 and 17. Therefore, the trial court properly declared a mistrial on Counts 16 and 17.

{¶ 45} As to Count 19, despite the fact that the verdict form indicated "guilty," Juror No. 7 agreed that she voted "not guilty" as to co-defendant Burney:

> THE COURT: Until you have questions, everything else is fine.

Count 19, you're okay with that?  That has all three defendants in it.

JUROR 7:  Um-hmm.

THE COURT:  And you had a not guilty on Burney and not guilty on Smith, I believe.

JUROR 7:  Um-hmm.

(Tr. at 4367-68.)  Shortly thereafter, she agreed that Pippins and Burney were guilty with regard to transporting but ultimately indicated she was not sure of her verdict with regard to Pippins:

THE COURT:  Okay.  And then with Mr. Pippins, I believe.

JUROR 7:  Two charges.

THE COURT:  Okay.

JUROR 7:  Not guilty on gun.  Guilty on transport, ship.  Was he tried with transporting and shipping too?

THE COURT:  I can't answer that.  Okay?  Not guilty on gun but guilty on transport with regard to Burney.  Is that, in fact, your verdict?

JUROR 7:  Yes.

THE COURT:  Smith, I believe, was not guilty.

JUROR 7:  Not guilty.

THE COURT:  That leaves Pippins.  You have a note there that I can't --

JUROR 7:  Two charges.  I was wanting clarification.  Was he being charged with trafficking in heroin and --

THE COURT:  It's trafficking with ship and transport.

JUROR 7:  Yes.

THE COURT:  Is that your verdict there, or you're not sure?

JUROR 7:  I don't have anything up there.

THE COURT:  Okay.

JUROR 7:  Because I wasn't sure what that charge actually was, was it for the trafficking in heroin and shipping and transport.

THE COURT:  You're not sure of that particular charge?

JUROR 7:  Um-hmm.

THE COURT:  Let me highlight that one as well.  Thank you.

(Tr. at 4368-69.)

{¶ 46}  Juror No. 7 indicated variously that she voted "guilty," "not guilty," and was "not sure of that particular charge," as Pippins and Count 19.  (Tr. at 4367-69.)  In other words, as to Count 19, the jury poll revealed the "appearance of [] uncertainty or contingency in [the] jury's verdict."  *Sneed* at 14.  The trial court's entry regarding Count 19 states the trial court concluded the juror "was not sure of that particular charge."  (Feb. 10, 2015 Entry at 3.)  Then, in a footnote, the trial court added, "[s]ince the juror has since been discharged, any further information would be evidence *aliunde*, and so the Court declares a mistrial as to Keith Pippins on this charge, Count 19."  (Emphasis sic.)  (Feb. 10, 2015 Entry at 3.)  But the trial court did not include Count 19 in its list of mistried counts on the final page of the entry, did not dismiss that count in its later entry, and ultimately sentenced Pippins to serve six consecutive years on Count 19.  This was plainly erroneous.

{¶ 47}  With respect to Counts 20 and 21, a similar point of confusion arose with Pippin and, additionally, the juror indicated she had been pressured:

THE COURT:  * * * All right.  Count 20.

JUROR 7:  That's the confusion because it is basically the same thing.  Sell or offer, and one was ship and transport.

And we played the audio.  I thought when I heard on the wiretap stuff that that was Jack Morris saying drop off at my mom, not Keith Pippins.

THE COURT:  So you have a question on this one as well then?  You've got guilty.

JUROR 7:  Down here I got that all scratched out.  I went on and voted because I was pressured.

THE COURT:  What does that mean?

> JUROR 7:  Well, I thought when I heard the audio it was Jack Morris say drop it off at my mommy's, not Keith Pippins.
>
> THE COURT:  Okay.  Percy Burney, you have a line with guilty on it, and you have a line with guilty to Pippins, but you crossed that out.
>
> JUROR 7:  I scratched that off.  That's why I have guilty there.
>
> THE COURT:  With regard to Count 21, you believe that Mr. Burney is guilty.  Is that your verdict?
>
> JUROR 7:  Um-hmm.
>
> THE COURT:  With Pippins you're not sure?
>
> JUROR 7:  I was pressured into it.
>
> [PIPPINS' COUNSEL]:  She was pressured into it.
>
> JUROR 7:  I'm sorry.
>
> THE COURT:  Don't worry about that.
>
> JUROR 7:  Okay.  I understand.

(Tr. at 4369-70.)  The trial court properly found a mistrial on Counts 20 and 21 as a result of the confusion and juror pressure.

{¶ 48}  The jury did not complete a verdict form as to Count 25 (attempted murder) but did complete forms finding Pippins guilty of felonious assaults in Counts 26 and 27. However, Juror No. 7 had "real issues" about whether Pippins was guilty of the felonious assaults as the verdict forms had indicated:

> THE COURT:  I know that Count 25, 26, 27, you had question marks.  I believe that one of the defendants was found not guilty.
>
> [PROSECUTOR]:  Burney on all three.
>
> THE COURT:  Burney found not guilty on all three, the attempted murder, the felonious assault, the other felonious assault, so that leaves Mr. Pippins.
>
> JUROR 7:  This is where -- that's why you all got that last sheet the way that it is.

> THE COURT:  This is the one that you basically had some real issues with?
>
> JUROR 7:  Real issues.
>
> THE COURT:  We will put that -- to the extent that anyone was found guilty on these, we will just highlight those.  Fair enough?
>
> JUROR 7:  Um-hmm.

(Tr. at 4371.)  The trial court properly declared a mistrial on these counts.

{¶ 49} On Count 29, the juror again indicated that she had been confused as to whether Pippins had actually committed the crimes discussed on the recorded telephone calls:

> THE COURT:  All right.  29.
>
> JUROR 7:  The Mexican guy, the drugstore guy, that was we never could understand, although he was saying he was doing all this, but did he actually follow through with it?  Did he actually go do that?  We all was mixed up on that.
>
> THE COURT:  You're not sure on this one?
>
> JUROR 7:  Yes.

(Tr. at 4371-72.)  Thus, Count 29 was properly considered the subject of a mistrial and dismissed.

{¶ 50} As to Count 30, after indicating that she was not sure of her verdict, Juror No. 7 added that she had been pressured into it:

> THE COURT:  All right.  Count 30, this one here.
>
> JUROR 7:  Huh-uh.  That's why I got that scratched off.
>
> THE COURT:  Not sure?
>
> JUROR 7:  Huh-uh.
>
> * * *
>
> THE COURT:  * * * Now, is that in regard to Count 30?
>
> JUROR 7:  This is heroin.
>
> THE COURT:  Okay.

> JUROR 7:  For him.
>
> THE COURT: Yes. Is that your verdict, or do you have a problem with that?
>
> JUROR 7:  I was pressured into deciding.
>
> THE COURT:  Okay.  Take that one out then.

(Tr. at 4372-73.)  Count 30 was properly considered the subject of a mistrial and dismissed.

{¶ 51}  With respect to Count 32, Juror No. 7 indicated she needed to refresh her recollection by listening to evidence regarding that count.  The trial court indicated it would consider whether to do that:

> THE COURT:  * * * Count 32.
>
> JUROR 7:  Are we going to go back and hear all this in court now?
>
> THE COURT:  No.  You can't deliberate in court.
>
> JUROR 7:  No, not deliberate but hear it.
>
> THE COURT:  No.
>
> JUROR 7:  Okay.
>
> THE COURT:  If that would help you refresh your recollection, that's another matter.
>
> JUROR 7:  That's what I want to do.
>
> THE COURT:  All right.  Let me think about that one.

(Tr. at 4372-73.)  But the court never returned to further consider Count 32 and, thus, based on Juror No. 7's uncertainty, that count was also properly the subject of a mistrial.

{¶ 52}  On Count 33, Juror No. 7 said there had been a great deal of disagreement and fighting and expressed that she felt pressured on that count:

> THE COURT:  Okay.  Count 33, possession of heroin.
>
> JUROR 7:  Did I do not guilty on her?
>
> THE COURT:  [The second co-defendant], I believe, was a guilty, and Keith Pippins was a guilty.
>
> [PROSECUTOR]:  The possession count.

> THE COURT: The possession count.
>
> [PROSECUTOR]: That's correct. It was guilty for both on possession.
>
> [PIPPINS' COUNSEL]: But apparently --
>
> THE COURT: No. Don't say anything. What are you thinking?
>
> JUROR 7: I don't know what happened here, but I would have never voted [the second co-defendant] guilty on that.
>
> THE COURT: This is not guilty. This is you pointing at this one, the trafficking in heroin. She was found not guilty of that.
>
> JUROR 7: Oh, okay, because here I put only on Pippins. You see, I put only on Pippins.
>
> THE COURT: Now, Count 33.
>
> JUROR 7: Huh-uh.
>
> THE COURT: Huh-uh what?
>
> JUROR 7: There was a big fight about this.
>
> THE COURT: What's your take on it? Are you okay with the verdict of guilty or not guilty?
>
> JUROR 7: I was so upset and crying back there.
>
> THE COURT: Okay.
>
> JUROR 7: I think I was pressured into it.
>
> THE COURT: On this one?
>
> JUROR 7: Um-hmm.

(Tr. at 4373-74.) Because the juror stated she felt she had been "pressured" into it we agree that the trial court properly declared a mistrial on that count. We note, however, that Count 33, for reasons unclear, was not dismissed.

{¶ 53} On Count 34, the juror again expressed that she was not sure about Pippins' guilt:

> THE COURT: Okay. All right. Weapon under disability, Count 34, trafficking in heroin.

JUROR 7:  I got Pippins.

THE COURT: Pippins only. Not guilty [the second co-defendant]?

JUROR 7:  Um-hmm.

THE COURT:  Is that fair?

JUROR 7:  Um-hmm.

THE COURT:  Is that your verdict?

JUROR 7: I had them explain to me with all the charges running together -- can I ask you a question?

THE COURT:  Yes.

JUROR 7:  Or you all a question.

THE COURT:  Me.  You can ask me a question.

JUROR 7:  If the heroin is in -- I'll use me -- in my house.

THE COURT:  I can't answer a factual question.  Okay?  I can answer a legal question.

JUROR 7:  Okay.

THE COURT:  So, I mean, you put Pippins only, not guilty [on the second co-defendant].  What does that mean?

JUROR 7:  I think here when they said this, they was saying we was only going over the evidence for him.  I think that's why I put only there, but I was thinking either one of them.  I think it was there was multiple people in the house doing all kind of stuff.  We was arguing about anybody could have brought that in there, so I didn't want that.

THE COURT:  You're not sure on that one?

JUROR 7:  Um-hmm.

(Tr. at 4375-76.)   In its entry declaring a mistrial, the trial court found the juror had recounted feeling "pressured as to Count 33 and 34."  (Feb. 10, 2015 Entry at 3.)  Despite this and the testimony from Juror No. 7, the trial court did not declare a mistrial on Count 34, did not dismiss it, and ultimately sentenced Pippins to six consecutive years on it.  We

find that the jury poll revealed the "appearance of [] uncertainty or contingency in [the] jury's verdict," that the trial court did not complete its "duty" to "resolve" the "appearance of [] uncertainty" and, thus, there "is no verdict" as to this count. *Sneed* at 14. A mistrial should have been declared as to Count 34 and the trial court plainly erred in not doing so.

{¶ 54} As to Counts 3, 4, 5, 6, 7, 9, 12, 13, 14, 18, 22, 23, 24, 28, 31, 35, 36, and 37, however, Juror No. 7 stated the verdicts were her genuine, freely given verdicts (notwithstanding some initial uncertainty on some of them):

> THE COURT: I understand. Count 3 and Count 4, you got those checked. Same sort of thing or what?
>
> JUROR 7: No. I went back to page 11, got clarification for myself.
>
> THE COURT: That was a guilty verdict as to Count 3?
>
> JUROR 7: Um-hmm.
>
> THE COURT: So Count 3 is fine?
>
> JUROR 7: Um-hmm.
>
> THE COURT: Count 4?
>
> JUROR 7: I had to go back. I went back to the audio on 197 and 218. I went back to that. We listened to it.
>
> THE COURT: Count 4.
>
> JUROR 7: I went to the audio. After reading this and listening to it more, I was still kind of not sure there.
>
> THE COURT: Well, okay. So you're not sure as to guilt or as to amount or what?
>
> JUROR 7: Yes.
>
> THE COURT: What?
>
> JUROR 7: The heroin because there was some confusion whether it was heroin or whether it was pills. Then when I went back and I listened to it -- I forget the person's name. It was the heroin.
>
> THE COURT: What does that mean?

JUROR 7:  I was okay.

THE COURT:  You're okay with Count 4?

JUROR 7:  Um-hmm.

THE COURT:  Count 5, no question marks.  Are you okay with Count 5?

JUROR 7:  Yes.  I went to the stuff.

THE COURT:  You went to the things.  You found what you needed?

JUROR 7:  Um-hmm.

THE COURT: Count 6, weapon under disability, anything there?

JUROR 7:  I wasn't sure exactly what that meant other than he was under some kind of investigation; he wasn't supposed to have a firearm.

THE COURT:  He was under indictment.

JUROR 7: Under indictment.  He couldn't have a firearm; is that correct?

THE COURT:  Yes.

JUROR 7:  When I went back and I read through that, I found some place in the audio file or something there was guns in the house and they saw the guns and stuff, so that's when I made my choice, and I was okay with it.

THE COURT:  You're okay with guilty on that?

JUROR 7:  Um-hmm.

THE COURT: If you raised any questions that were not resolved to your satisfaction -- we'll get to that, but I just want to go through each of these.  You don't have to go through each count and tell me your reasoning.  If you had any issue that was not resolved, in other words, so, for example, Count 7, was that a guilty verdict, and is that one okay?

JUROR 7:  That's correct.  Okay.

* * *

THE COURT:  * * * [Count] 9?

JUROR 7:  That was okay.

* * *

THE COURT:  Count 12, anything there?

JUROR 7:  We resolved it.

THE COURT:  That was okay?

JUROR 7:  Um-hmm.  We resolved it.

THE COURT:  Your verdict is guilty?

JUROR 7:  Um-hmm.

THE COURT:  You're fine with that?

JUROR 7:  Um-hmm.

THE COURT:  Count 13, trafficking, Felony 3.

JUROR 7:  Um-hmm.

THE COURT:  Count 14?

JUROR 7:  Yeah.  I was okay.

THE COURT:  Okay.  Okay means the guilty verdict is yours?

JUROR 7:  Yes.

* * *

THE COURT:  Count 18 you're fine with?

JUROR 7:  Um-hmm.

* * *

THE COURT:  Okay.  All right.  Count 22.

JUROR 7:  I was okay with that.

THE COURT:  All right.  Count 23.

JUROR 7:  I was okay.

THE COURT:  All right.  Count 24.

JUROR 7:  I was okay.

* * *

THE COURT:  Tampering with evidence.

JUROR 7:  I was okay with that.

* * *

THE COURT:  Okay.  Count 31.

JUROR 7:  I finally came around on that.

THE COURT:  Is that your verdict?

JUROR 7:  Oh, yes.  They had to play it and play it over and over again, though.

THE COURT:  I understand that.  That's what deliberations can involve.

* * *

THE COURT:  * * * All right.  Count 31, I didn't catch on that one with regard to Mr. Pippins and Mr. Burney.

JUROR 7:  I believe there was manufacturing.

THE COURT:  Okay.  Is that your verdict?

JUROR 7:  Um-hmm.

* * *

THE COURT:  Weapon under disability, Mr. Pippins, Count 35?

JUROR 7:  There was weapons in the house, so I was okay with that.

THE COURT:  Is that your verdict?

JUROR 7:  Um-hmm.

THE COURT:  Count 36, is that your verdict?

JUROR 7:  Yes.

THE COURT: Okay. Count 37, weapon under disability?

JUROR 7: Um-hmm.

THE COURT: Is that your verdict?

JUROR 7: Um-hmm.

* * *

THE COURT: Okay. All right. Very good. As long as you're up here then, for those things that you said yes, those are your verdicts, those are freely, voluntarily entered by you, and the other ones you just felt you were pressured? Is that a fair statement?

JUROR 7: Yes.

THE COURT: Those are your verdicts, and the other ones you're not sure?

JUROR 7: Yes.

(Tr. at 4362-78.)

{¶ 55} Pippins argues the trial court should have declared a mistrial on all counts. Pippins argues the pressure on Juror No. 7 was pervasive to the point that none of the verdicts reached could be considered valid. We disagree. With regard to some counts, Juror No. 7 indicated she felt pressured and recounted that there was "a big fight about this" that left her "upset" and "crying." (Tr. at 4374.) She indicated she had "[r]eal issues" with some counts. (Tr. at 4371.) She also indicated some uncertainty, or at least initial uncertainty, with respect to some counts. She expressed confusion with respect to how she voted on a number of counts. She also indicated she voted "not guilty" on one count when the verdict forms reflect a guilty finding and that she voted "guilty" on one count when the verdict forms reflect a not guilty finding. She also expressed she was confused and "all the charges [were] running together." (Tr. at 4375.) However, with respect to many of the counts, she did not indicate any lasting problems. At the conclusion of the discussion of her verdicts, she stated the following:

THE COURT: Okay. All right. Very good. As long as you're up here then, for those things that you said yes, those are your verdicts, those are freely, voluntarily entered by you, and the

> other ones you just felt you were pressured?  Is that a fair statement?
>
> JUROR 7:  Yes.
>
> THE COURT: Those are your verdicts, and the other ones you're not sure?
>
> JUROR 7:  Yes.

(Tr. at 4377-78.)   In short, while the record in this case evidences a significant level of confusion on the part of all involved, not every count was rendered defective as a result.  We find no error in the trial court's decision to take Juror No. 7's statements at face value and hold that some of the counts reflected her free and voluntary verdicts.  Therefore, we sustain in part and overrule in part Pippins' fourth assignment of error.

{¶ 56}  Pippins argues in his second assignment of error that the jury's verdict as to Count 1 was based on insufficient evidence.  Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."  * * *  In essence, sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *Black's Law Dictionary* 1433 (6th Ed.1990).  "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 57}  R.C. 2923.32(A)(1) defines engaging in a pattern of corrupt activity, in relevant part, as follows:

> No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

"Corrupt activity" includes incidents of drug trafficking in violation of R.C. 2925.03 "when the proceeds of the violation, the payments made in the violation, * * * or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars" or when the same is true of "any combination of violations described in division (I)(2)(c) of [R.C. 2923.31]." R.C. 2923.31(I)(2)(c). A "pattern of corrupt activity" is "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶ 58} Not considering the counts we vacate in this decision, the counts on which Pippins was not found guilty by the jury, and the counts for which the trial court properly declared a mistrial due to a lack of unanimity among the jurors, Pippins was still validly convicted on significant counts of heroin trafficking, cocaine trafficking, and oxycodone trafficking. Pippins does not argue that insufficient evidence was introduced of incidents of corrupt activity but, instead, focuses on whether the state introduced sufficient evidence of an "enterprise."

{¶ 59} An "enterprise" is defined as follows:

> "Enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. "Enterprise" includes illicit as well as licit enterprises.

R.C. 2925.31(C). An enterprise which is not formally established (as, for example, an LLC or partnership would be) is an "association-in-fact" enterprise and "has been defined as 'a group of persons associated together for a common purpose of engaging in a course of conduct.' " *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 9, quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981), citing *Boyle v. United States*, 556 U.S. 938, 948 (2009). For purposes of federal RICO, after which Ohio's law is modeled, *see Beverly* at ¶ 3, an "association-in-fact" enterprise has been defined to require "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* at 946.

{¶ 60} "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other." (Internal quotation marks omitted.) *Beverly* at ¶ 10, quoting *Boyle* at 947; *Turkette* at 583, citing *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, ¶ 13. However, "logically, evidence that proves one of the elements can sometimes prove the other, even though it doesn't necessarily do so." *Id.* at 10. Thus, depending on the facts of the case, "an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *Id.* at ¶ 13.

{¶ 61} In this case, the lead detective testified his wiretapping investigation revealed a drug-dealing organization led by Morris. As the investigation continued, the detective developed evidence that Pippins and Morris were the co-heads of the drug-dealing organization. Pippins and Morris, he testified, were partners who used a common supplier of heroin and cocaine. Morris confirmed that he and Pippins were partners, that they pooled their money in order to buy drugs, and that they split the profits of dealing evenly between them. He explained that they had a Mexican connection from whom they daily purchased heroin and that they also shared customers. Morris testified another person listed in the indictment had the role of "[f]lunkey" in the organization, cutting heroin, cleaning up, and running errands. (Tr. at 2022.) There was also testimony from another witness to the effect that there was no organization and that the persons indicted were just individuals using each other as suppliers and customers in pursuit of their individual interests. However, sufficiency analysis is not an opportunity to compare and weigh evidence; the question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *Monroe*, 2005-Ohio-2282, at ¶ 47. Drawing all inferences in favor of the state, we find that a rational jury could have concluded that there was a drug-dealing "enterprise" with which Pippins was "associated" and in which he "participate[d]." R.C. 2923.32(A)(1). For these reasons, Pippins' second assignment of error is overruled.

{¶ 62} Pippins argues in his third assignment of error that his counsel was ineffective for failing to file a motion for severance. Ineffective assistance of counsel claims

are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense."  *Id.* at 687.  The failure to make either showing defeats a claim of ineffective assistance of counsel.  *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697 (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ").  In this case, Pippins alleges that his trial counsel was deficient in failing to move to sever Pippins' case from that of his co-defendants.

{¶ 63}  In non-capital cases, "[t]wo or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct."  Crim.R. 8(B).  However, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants in an indictment * * * or by such joinder for trial together of indictments * * *, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."  Crim.R. 14.

{¶ 64}  One example of prejudice from improper joinder of defendants for trial is mutually antagonistic defenses, which are cases in which defendants seek to exculpate themselves at the cost of inculpating co-defendants.  *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 23-27, citing *inter alia Zafiro v. United States*, 506 U.S. 534, 538-39 (1993); *Bruton v. United States*, 391 U.S. 123 (1968).  Here, Pippins argues that this form of prejudice was present because one of his co-defendants' counsel argued during closing that the co-defendant was not a part of the drug-dealing enterprise between Pippins and Morris.  That is, counsel argued:

> You never heard any evidence of Mr. Burney belonging to any organization.
>
> When Jack Morris, Tyler Griffin, and Larry Stevenson testify - - and, again, you would think that they would be in a position to know -- when asked who was part of their organization, Percy Burney's name was never mentioned.

> Jack Morris talked about his relationship with Keith Pippins. Tyler Griffin talked about his relationship with Keith Pippins. Larry Stevenson talked about his relationship with Keith Pippins. Nobody talked about their relationship as far as any illegal activity is concerned with Percy Burney. You never heard a single testimony, a single word, about Mr. Burney splitting any profits. Nobody said they made any money from selling drugs and then shared the proceeds with Mr. Burney. Nobody talked about or said anything about Mr. Burney going in with them to make an investment to acquire drugs. You never heard a single testimony about Mr. Burney setting any prices.

(Tr. at 3968.)

{¶ 65} The record contains no motion to sever by Pippins' trial counsel. There is also no formal order granting the state's motion to join the cases for trial. The first indication in the record that the trial court took any action on joinder appears in a transcript of the December 12, 2014 hearing. At the hearing, the court appeared to suggest the issue of joinder had been taken care of at a previous status conference, although the prosecutor's comments suggested the opposite. In other words, it appears that if the trial court ruled on the state's motion, it did so in an off-the-record proceeding at which Pippins' counsel may very well have opposed joinder and sought severance. This view is supported by statements made by the trial court when Pippins' trial counsel joined counsel for the other co-defendants in renewing a motion for severance:

> [BURNEY'S COUNSEL]: By law I have to renew my motion, my objection to the Court's ruling to not sever the trial --
>
> THE COURT: Understood.
>
> [BURNEY'S COUNSEL]: -- as it relates to the defendants and also renew the motion as relates to the joinder of the different indictments, so I want to make those objections again for the record for purposes --
>
> THE COURT: Okay. For the record, I take it, [Pippins' Counsel], do you join in that?
>
> [PIPPINS' COUNSEL]: Yes, Your Honor.
>
> THE COURT: [Second co-defendant's counsel], do you, please?

> [SECOND CO-DEFENDANT'S COUNSEL]:  Yes, Your Honor,
> I do too.
>
> THE COURT:  Thank you kindly.
>
> All right.  I've already ruled on them.  I understand the
> necessity of making the record, and, quite frankly, I'm glad you
> are.  So that's good.
>
> The objections are overruled, but they are noted for the record.
> Thank you.

(Tr. at 83.)  In short, it is not clear from the record that Pippins' defense counsel did fail to request severance.  Indeed, from the record that is preserved, it appears counsel probably did request that the cases be severed and not joined for trial.  The question then is whether the request was constitutionally ineffective.

> {¶ 66} According to Supreme Court precedent:
>
> To prevail on his claim that the trial court erred in denying his
> motion to sever, the defendant has the burden of
> demonstrating three facts. He must affirmatively demonstrate
> (1) that his rights were prejudiced, (2) that at the time of the
> motion to sever he provided the trial court with sufficient
> information so that it could weigh the considerations favoring
> joinder against the defendant's right to a fair trial, and (3) that
> given the information provided to the court, it abused its
> discretion in refusing to separate the charges for trial.

*State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus; *see also State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, ¶ 63. Here, because the request to sever was not preserved in the record, it is impossible to determine whether "at the time of the motion to sever [Pippins] provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against [Pippins'] right to a fair trial." *Schaim* at 59.  Because we cannot ascertain whether the off-the-record oral motion was of sufficient persuasive detail that it should have been granted, we cannot say that Pippins' counsel's failure to file a written motion was the sort of deficient performance that probably would have affected the outcome of the case.  That is, a defendant alleging ineffective assistance, "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Strickland* at 694. Since Pippins cannot show such a probability, his assignment of error falls short. For these reasons, we overrule Pippins' third assignment of error.

{¶ 67} Pippins argues in his first assignment of error that it was plain error for the same judge who approved the wiretap warrants to preside over his jury trial. Pippins' counsel did not object to the fact that the judge who administered the wiretap warrants in this case was the same judge who served as the trial judge. Thus, we review his assignment of error raising that issue for plain error. *Rogers* at ¶ 22. As discussed above, an accused seeking to show that an obvious error affected his or her substantial rights and, thereby, the outcome must demonstrate a "reasonable *probability* that the error resulted in prejudice," such that there is a "probability of a different result [that] is sufficient to undermine confidence in the outcome of the proceeding." (Emphasis sic and internal quotation marks omitted.) *Myers* at ¶ 130; *Rogers* at ¶ 22. Pippins disagrees with this analysis, arguing that the alleged error is structural and, thus, that it evades harmless error analysis.

{¶ 68} R.C. 2933.51 through 2933.66 set forth the procedure in Ohio for wiretapping investigations. Although magistrates are typically, though not necessarily, the persons who decide whether to issue warrants, wiretap warrants, also known as "interception warrants," must instead be obtained through common pleas court judges. *Compare* R.C. 2933.522 (authorizing judges of courts of common pleas to consider and issue wiretap warrants) *with* R.C. 2933.23 (authorizing judges *or* magistrates to issue a search warrant on a finding of probable cause); *see also* R.C. 2933.51(W) (defining "judge of a court of common pleas" to exclude judges which do not serve at least in part as "general jurisdiction" judges). The application for a wiretap warrant, like a typical search warrant, must set forth the cause that justifies seeking the warrant. R.C. 2933.53(B)(3) and 2933.54(A)(1) through (3). But unlike a typical warrant, the application for the warrant must also detail why normal investigative procedures have failed, are unlikely to succeed, or are too dangerous. R.C. 2933.53(B)(7) and 2933.54(A)(4). This is significant because it encourages an application to speak ex parte not only to the potential criminality being investigated but also to the offender's determination to avoid justice, which is a consideration the Supreme Court has previously emphasized in ruling that a judge who hears a motion to perpetuate testimony under Crim.R. 16(F) may not serve as trial judge in the same matter. *State v. Gillard*, 40

Ohio St.3d 226, 229 (1988), paragraph one of the syllabus. Moreover, unlike an ordinary warrant, a wiretap warrant contemplates continuing involvement by the common pleas court in the form of regular weekly updates to the judge on the investigation progress and the need for the warrant to continue. R.C. 2933.56(A)(11). In short, unlike in the case of an ordinary warrant, a wiretap warrant involves the judge in the investigation on a regular ongoing basis, informs the judge of the suspect's dangerousness or attempts to evade justice, and necessarily involves a type of judge, i.e., common pleas judge, that is the same type that might be called on to sit as a judge in the trial.

{¶ 69} Thus, we agree with Pippins that, if a judge both administers a wiretap investigation and then sits as the trial judge, this has the potential to be problematic. As the United States Supreme Court has stated:

> [N]o man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 [(1927)]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 [(1954)].

*In re Murchison*, 349 U.S. 133, 136 (1955). There is a danger that repetitive updates, repetitive approval, and long-term involvement of a judge in an investigation may lead to the judge developing, or being perceived to have developed, a personal interest in seeing the investigation reach a successful conclusion—the conviction of the elusive guilty targets. We also recognize, consistent with Pippins' argument that this amounts to structural error, that "[t]he presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis." *State v. Sanders*, 92 Ohio St.3d 245, 278 (2001), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

{¶ 70} However, a necessary prerequisite to invoking structural error under the plain language of *Sanders* is showing bias. While we recognize that, as compared to a

traditional warrant, the lengthier and more involved procedure for wiretap warrants presents a higher *potential* for a judge to develop, or be perceived to have developed, a bias in favor of the investigation, potentiality is not actuality. The Supreme Court has recognized that a judge who hears a large quantity of inflammatory information in connection with a request to perpetuate testimony under Crim.R. 16(F), should not sit as the judge in the trial of that case. *See Gillard* at paragraph one of the syllabus. However, the Supreme Court also recognized that a violation of that rule is not "*per se* prejudicial." *Id.* We find *Gillard* instructive in considering the situation under review.

{¶ 71} It is the burden of the accused, in this case, Pippins, to demonstrate that the judge became biased or that the judge participated so continuously in the investigation and was exposed to such prejudicial information that bias would be perceived by an objective observer reviewing the case. *See Sanders* at 278 (actual bias is structural error); *Murchison* at 136, quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954) (" 'justice must satisfy the appearance of justice' "). In this case, Pippins did not carry his burden.

{¶ 72} Pippins does not allege, and we did not find in our review of the record, any indication that the trial judge was actually biased against Pippins.

{¶ 73} The wiretap documents, which were attached to the state's memorandum contra Pippins' motion to suppress, do not paint a picture of a judge who was involved in the investigation to such an extent that his impartiality would be called into doubt by an objective observer. The trial judge signed warrants and applications for warrants on January 31, February 18 and 28, and March 4, 2014. Nothing else in the record suggests the trial judge was otherwise involved with the investigation or spending time on it prior to the filing of indictments. Though the warrants all indicated that seven-day reports on the investigation would be given to the judge, there is no indication in the record that occurred.

{¶ 74} It is true, as Pippins argues, that the warrant applications and affidavits contained material prejudicial to Pippins beyond the normal probable cause supporting content of warrant affidavits. This material took the form of statements by confidential informants that they feared harm to themselves and their families from Pippins if they cooperated and that Pippins and the others involved in the drug dealing organization had a history of dealing violently with enemies. But such statements are not significantly different from the material considered in *Gillard*, where the court was given information

ex parte that Gillard was the national president of the Outlaw motorcycle gang and that the gang and Gillard's brothers had threatened witnesses with death if the witnesses chose to cooperate with authorities.  *Gillard* at 228-29.

{¶ 75}  Because we find neither actual bias nor circumstances showing there would be an objective perception of bias in this case, structural error analysis is not invoked.  *See Murchison* at 136; *Sanders* at 278; *Gillard* at 229.  Because structural error analysis is not invoked and Pippins failed to object to the trial judge presiding over both the warrant procedures and the trial, we review the issue for plain error.  *Rogers* at ¶ 22.  Pippins relied wholly on his structural error argument and has not presented any argument that he suffered prejudice as a result of having the same judge hear the warrant applications and sit for the trial.  Thus, he has not demonstrated a "reasonable *probability*" that any error by the trial court in sitting for both the trial and warrant applications, resulted in prejudice such that there is a "probability of a different result [that] is sufficient to undermine confidence in the outcome of the proceeding."  (Emphasis sic and internal quotation marks omitted.)  *Myers* at ¶ 130; *Rogers* at ¶ 22.  For these reasons, we overrule Pippins' first assignment of error.

{¶ 76}  Accordingly, we overrule Pippins' first, second, and third assignments of error, and sustain in part and overrule in part Pippins' fourth assignment of error.  We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and remand this matter to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part*
*and reversed in part; cause remanded.*

SADLER, P.J., concurs.
BRUNNER, J., concurs in part and dissents in part.

BRUNNER, J., concurring in part and dissenting in part.

{¶ 77}  The majority finds that the trial court plainly erred in convicting and sentencing Pippins on Counts 19 and 34 for the following reasons:  Juror No. 7 stated that she was uncertain of her verdict as to Count 19 and, although the trial court declared a mistrial in a footnote of its mistrial entry on that count, it sentenced Pippins to 6 years on Count 19.  *See supra* at ¶ 45-46.  Juror No. 7 indicated she was uncertain of her verdict on

Count 34 and the trial court's mistrial entry found that the juror was pressured as to that count, but the trial court failed to find a mistrial and instead sentenced Pippins to 6 years on Count 34. *See supra* at ¶ 53. The majority therefore sustains in part Pippins fourth assignment of error and holds that these counts must be vacated. The majority finds no merit in any of Pippins' other three assignments of error and overrules them. I concur with these findings by the majority and the reasoning underlying the findings.

**{¶ 78}** However, I write separately because I would also find that Counts 1 and 15 should be vacated. My reading of the record, as faithfully preserved by the transcript, is that the trial court failed to poll Juror No. 7 as to Count 1. A review of the transcript indicates this same juror was pressured into her verdict on Count 15 by other jurors. Accordingly, I would also vacate as to those counts. Because the majority does not, I respectfully dissent to that extent.

**{¶ 79}** As I agree with the majority's articulation of the law in this area, I will only briefly repeat the principles involved. "Crim.R. 31(D) grants the trial judge or any party the absolute right to have the jury polled after it has returned its verdicts." *State v. Sneed*, 63 Ohio St.3d 3, 14, fn. 5 (1992). "If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged." Crim.R. 31(D). Thus, in the event of non-unanimity, a trial court has discretion whether to direct the jury "to retire for further deliberation" or to "discharge[]" the jury. *Id.* It cannot be overemphasized that a trial court does not have discretion to accept a non-unanimous verdict in a criminal case.

**{¶ 80}** Crim.R. 31(A) explicitly requires that a "verdict shall be unanimous." The Ohio Constitution requires that "[t]he right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."[1] Ohio Constitution, Article I, Section 5. The Supreme Court of Ohio has confirmed that Article I, Section 5 of the Ohio Constitution requires juror unanimity in criminal cases.

> [O]ur opinion is, that the essential and distinguishing features of the trial by jury as known at the common law, and generally, if not universally, adopted in this country, were intended to be preserved, and its benefits secured to the accused in all

---

[1] Though the exception permitting a three-fourths verdict for civil trials was added in 1912, the Constitution has never been amended to include an exception to the implied unanimity requirement for criminal cases.

criminal cases, by the constitutional provisions referred to [Ohio Const. Art. 1, Sec. 5]. That it is beyond the power of the General Assembly to impair the right, or materially change its character; that the number of jurors cannot be diminished, or a verdict authorized short of a unanimous concurrence of all the jurors.

*Work v. State*, 2 Ohio St. 296, 306 (1853) (overruled as to the holding regarding the absolute immutability of the number of jurors in misdemeanor cases in *State ex rel. Columbus v. Boyland*, 58 Ohio St.2d 490 (1979), syllabus); *see also State v. Robbins*, 176 Ohio St. 362, 364 (1964); *McHugh v. State*, 42 Ohio St. 154, 156 (1884); *see also Richardson v. United States*, 526 U.S. 813, 820 (1999) (remarking that "this Court has indicated that the [federal] Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition"); *but cf. State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 35 (plurality decision remarking that Ohio only imposes a unanimity requirement by rule).

{¶ 81} Because unanimity is required explicitly by rule and implicitly by the Constitution, when there is " '[i]n any case * * * the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for "there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." ' " *Sneed* at 14, quoting *United States v. Morris*, 612 F.2d 483, 489 (10th Cir.1979), quoting *Cook v. United States*, 379 F.2d 966, 970 (5th Cir.1967). Thus, " 'a jury has not reached a valid verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered.' " *Sneed* at 14, fn. 5, quoting *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir.1975). And once a jury has been discharged, the verdict cannot be altered. *Sargent v. State*, 11 OHIO 472, 473 (1842).

{¶ 82} The law requires that a jury must be polled if the defendant requests it and there is no verdict until it is "announced in open court" without "any uncertainty or contingency." *Sneed* at 14, fn. 5. A conviction may not stand based on a "verdict" that is accepted without being unanimous and announced in open court, because a defendant has a "substantial right to a unanimous jury verdict." *State v. Rawson*, 10th Dist. No. 14AP-1023, 2016-Ohio-1403, ¶ 23-24. Consequently, an unanimity error is a "defect[] affecting substantial rights." Crim. R. 52(B). In other words, an unanimity error always affects the

outcome and is plain.  *Id.*; *Rawson* at ¶ 23-24; *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir.1992).

{¶ 83} In this case, the jury initially announced verdicts finding Pippins guilty of Count 1 (pattern of corrupt activity), Counts 2, 4, 5, 7, 10, 12, 16, 18, 19, 20, 21, 23, 24, 29, 30, 32, and 34 (heroin trafficking), Counts 3 and 13 (cocaine trafficking), Counts 14, 15, and 22 (oxycodone trafficking), Counts 9, 17, and 31 (manufacture of drugs), Count 33 (heroin possession), Counts 26 and 27 (felonious assault), Counts 6, 35, 36, and 37 (weapon under disability), and Count 28 (tampering with evidence). (Feb. 10, 2015 Verdict Forms[2]; Tr. at 4328-47, 4349-51.)  Then the defendants, including Pippins, requested that the jury be polled.  (Tr. at 4349.)

{¶ 84} As to Count 1 (pattern of corrupt activity), the trial court did not poll Juror No. 7 as requested by the parties and instead started at Count 2:

> THE COURT: Okay. You're Juror Number 7.
>
> Okay. Now, with regard to the verdicts involving Keith Pippins, are these your verdicts?
>
> JUROR 7: Yes.
>
> THE COURT: Freely, voluntarily, and independently found and entered by you?
>
> JUROR 7: Can I ask you a question, or can I say anything?
>
> THE COURT: Yes. I'll tell you what. Why don't you write it down? Can you do that?
>
> Let me just give you a piece of paper and a pen.
>
> THE COURT: Thank you.
>
> Okay. Okay. What I'm going to do then is I'm going to go through these individually with you. Okay?
>
> All right. And let's see here. Okay. Count 1, I'm going to go -- these are all with regard to Mr. Pippins. Okay. What?
>
> Tell you what. Do you want to approach?

---

[2] The verdict forms for Counts 24 and 26 are dated February 3.  Counts 1, 17, 29, 30, 31, and 32 are dated February 4.  The verdict forms for Counts 27 and 28 are dated February 5.  The remaining verdict forms are dated February 2.  Thus, for simplicity, I refer to the verdict forms by the filed date.

JUROR 7: Yes.

THE COURT: Okay. Come on and do that.

Noise, again, please. Then we will need counsel up here as well.

[PIPPINS' COUNSEL]: Do you want the attorneys?

THE COURT: Yes. Noise, please.

- - -

Thereupon, the following discussion was held at the bench with the court and counsel outside the hearing of the jury:

THE COURT: Okay. Now, let me just get your note here. Okay. It says here some of the charges I wasn't quite clear about. Hence the reason for my further note.

Okay. So that's why I wanted to go over each one of these with you. And , basically, I'll hand them to you. Okay? And then - -

JUROR 7: You know that packet that you gave us? If I could look at that.

THE COURT: Yes. Go get it.

JUROR 7: Thank you.

THE COURT: I think that was the one that said do we have to - - is it an all or nothing type of thing.

Come on up here, please. Thank you.

Now, how do you want to go through this? You got them all?

JUROR 7: Yeah.

THE COURT: Very good.

JUROR 7: I have detailed notes.

THE COURT: Let's go back to Count 1 then, and that starts right here. Showing us your notes, and we'll start out with Count 2, Keith Pippins, these are your notes, right?

JUROR 7: Yes.

> THE COURT: What you've got here is Count 2, Count 2, guilty. And checkmark, that means you agree with that?
>
> JUROR 7: I had questions. I had some questions.
>
> THE COURT: With Count 2 you had a question, you say?
>
> JUROR 7: Um-hmm.

(Tr. at 4359-61). The trial court never returned to Count 1 after becoming distracted by the juror's notes and therefore never received an affirmation from Juror No. 7 that Count 1 was her free, voluntary, and independent verdict. Thus, as to that count, the poll and, hence, verdict were incomplete and were still incomplete when the jury was discharged. Thus, Pippins' conviction on Count 1 is based on an incomplete verdict, constitutes plain error, and cannot stand. *Sneed* at 14.

{¶ 85} The majority quotes this same section of transcript but then notes that the trial court later indicated its belief that Juror No. 7 had " 'nothing with regard to Count 1.' " *See supra* at ¶ 35, quoting Tr. at 4388. The majority also observes that the trial court's entry from February 10, 2015, states that Juror No. 7's notes (which were never introduced or read into the record) "indicate[d] that there was no problem with the first count." (Feb. 10, 2015 Decision & Entry at 2.) *See supra* at ¶ 37. The majority accepts these statements by the judge as authoritative indications that Juror No. 7 had no problem with Count 1 and seems to be taking the position that as long as no problems were indicated with a count, we should assume the juror would have adopted the verdict as her own during the poll. *See supra* at ¶ 35-39. The transcript demonstrates that the purported "indication" was, rather, an abdication by the trial court of its duties to ensure "inviolate" the defendant's right to a trial by a jury of his peers, as guaranteed by and intrinsic to the rule of law. Ohio Constitution, Article I, Section 5.

{¶ 86} With all due respect to the views of the majority and the efforts made by the trial court, I believe that when there is "in any case * * * the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for there is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." (Internal quotation marks omitted.) *Sneed* at 14. Here, this juror registered what is fairly characterized as a general uncertainty about her verdicts. With respect to Counts 15, 16, 20, 21, 30, and 33, Juror No. 7 indicated she felt pressured and

with respect to one, Count 33, she recounted that there was "a big fight about this" that left her "so upset" and "crying." (Tr. at 4365-67, 4369-74.) She indicated she had "[r]eal issues" with Counts 25, 26, and 27. (Tr. at 4371.) She also indicated some uncertainty (or at least initial uncertainty) with respect to Counts 2, 4, 6, 17, 19, 21, 29, 30, 32, and 34. (Tr. at 4362-64, 4367-76.) She expressed confusion with respect to how she voted on a number of counts. She indicated she voted "not guilty" on Count 10 when the verdict forms reflect a guilty finding and that she voted "guilty" on Count 11 when the verdict forms reflect a not guilty finding. *Compare* Tr. at 4364-65 *with* Feb. 10, 2015 Verdict Forms. Juror No. 7 expressed two different beliefs as to her vote on Count 19 with respect to Percy Burney before indicating she was uncertain. (Tr. at 4368-69.) The juror indicated that she would never have voted guilty on Count 33, notwithstanding the guilty verdict executed by the jury. (Tr. at 4374.) She also expressed that she was confused and that "all the charges [were] running together." (Tr. at 4375.) In short, she demonstrated a high level of confusion and never conveyed an indication of any type that, unless she expressed a problem with a count, the court should assume the jury's verdict was her verdict. In fact, her discussion with the trial judge concluded as follows:

> THE COURT: Okay. All right. Very good. As long as you're up here then, for those things that you said yes, those are your verdicts, those are freely, voluntarily entered by you, and the other ones you just felt you were pressured? Is that a fair statement?
>
> JUROR 7: Yes.
>
> THE COURT: Those are your verdicts, and the other ones you're not sure?
>
> JUROR 7: Yes.

(Tr. at 4377-78.)

{¶ 87} To summarize, the transcript indicates this juror was not polled in open court as to whether Count 1 was her free and voluntary verdict. Thus, Count 1 is, by her own statements, among "the other ones" for which she was "not sure." (Tr. at 4377-78.) Given the high level of confusion the juror otherwise indicated, and regardless of the trial judge's after-the-fact statements, we fail in our duty to the rule of law if we make assumptions about how the juror might have responded had she been polled in open court on Count 1. Because

we cannot make such an assumption about how she would have responded, the transcript indicates that the verdict on Count 1 is uncertain; thus, I would reverse as to Count 1.  As the majority does not, I dissent.

{¶ 88} Juror No. 7 also indicated she was pressured with respect to Counts 15, 16, and 17:

> THE COURT: Okay. Count 15?
>
> JUROR 7: I was on the fence on this, but I voted guilty.
>
> THE COURT: Well, do you believe that he was guilty? Did the state meet its burden of proof? Are you satisfied that it's a guilty verdict here?
>
> Again, you reach a verdict based on your own decision, not upon the consensus, or what have you, just to be friendly.
>
> JUROR 7: I think that's what I did there.
>
> THE COURT: Why you did what?
>
> JUROR 7: I think I was pressured into that decision.
>
> THE COURT: Count 15 or which count?
>
> I think we had gotten to -- I think we were at 15.
>
> No. I'm sorry. We were at 16.
>
> JUROR 7: We was here.
>
> THE COURT: So that's what you're not sure. Everything else is fine but that one?
>
> JUROR 7: Um-hmm.
>
> THE COURT: No. That was not her verdict, at least at that point. I'm going to highlight that one. Just going to put a little highlight through so that I know. Her Counts 2 or 3, well we'll come back to that. Okay.
>
> [PIPPINS' COUNSEL]: I would like to note her language was she felt she was pressured.
>
> THE COURT: Yes. I understand that.
>
> Okay? Let me continue. Thank you.

> All right. Count 17. All right? There you've got question marks, and you've got some of your own notes there.
>
> JUROR 7: I have to say this too. I have no understanding of drugs and the terminology, you know, the language and stuff. I think I even mentioned that in here, and so they was talking about cutting stuff, melting stuff, I got to cut it, I got to fix it. Our understanding back there was not the same, and we would go around and around.
>
> THE COURT: With regard to 17, you're not sure?
>
> JUROR 7: Um-hmm.

(Tr. at 4365-67.)   Because the trial court apparently lost track of what count was under discussion, the record suggests Juror No. 7 was pressured with respect to both Counts 15 and 16.  The trial court's entry included language that hand gestures by Juror No. 7 showed that she was only pressured on Counts 16 and 17.  (Feb. 10, 2015 Decision & Entry at 2, fn. 2.)  But this Court decides cases based on what actually exists in the record as it is preserved for appeal.  *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, ¶ 13 ("[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial.").  The trial court did not, during the colloquy with Juror No. 7, describe for the record what the juror was doing or insist on an intelligible oral response.  Absent those measures that would have supported the trial court's ruling, the transcript speaks for itself and shows that Juror No. 7 was indicating uncertainty and pressure as to Count 15 also.  When the trial court properly declared a mistrial on Counts 16 and 17, it also should have done so for Count 15 based on the state of the transcript as preserved for appeal.  Because the majority does not, I dissent.

{¶ 89} "The right of trial by jury shall be inviolate." Ohio Constitution, Article I, Section 5.  It is therefore beyond the power of the legislature, the executive, the courts, or any power, save only the people themselves by amendment to the Constitution, to abridge the right for the verdict of a jury in a criminal case to be unanimous before a conviction may be obtained. *Robbins*, 176 Ohio St. at 364; *McHugh*, 42 Ohio St. at 156; *Work*, 2 Ohio St. at 306; *see also Richardson*, 526 U.S. at 820.  In Pippins' case, the after-the-fact narrations by the trial court of what does not exist in the record (gestures, unless verbally narrated or described by the one expressing or observing them, such that words are also used to convey

what these gestures are or purport to be) cannot exist in a transcript.  Nor can notes that are never read or introduced into evidence be part of a transcript.   The state of the record imbues little to no confidence that Juror No. 7 agreed with her fellow jurors as to Counts 1 and 15.   Convicting Pippins on those counts constituted plain error and I dissent accordingly.  Otherwise, I concur in other holdings in the opinion not addressed by this dissent.

_____